Kristen Lake Cardoso (SBN 338762)
**KOPELOWITZ OSTROW P.A.**
One W Las Olas Blvd, Suite 500
Fort Lauderdale, FL 33301
Tel.: (954) 525-4100
cardoso@kolawyers.com

*Attorney for Plaintiff and the Proposed Class*

**IN THE UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF CALIFORNIA**
**SACRAMENTO DIVISON**

| | |
|---|---|
| ALEXIS BARNES, on behalf of herself, and all others similarly situated,<br><br>Plaintiff,<br><br>v.<br><br>PAIDWORK LLC,<br><br>Defendant. | Case No.:<br><br>**CLASS ACTION COMPLAINT**<br>1. NEGLIGENCE;<br>2. UNJUST ENRICHMENT; AND<br>3. BREACH OF IMPLIED CONTRACT<br><br>**DEMAND FOR A JURY TRIAL** |

Plaintiff Alexis Barnes ("Plaintiff") brings this Class Action Complaint ("Complaint") against Paidwork LLC ("Defendant") as an individual and on behalf of all others similarly situated, and alleges, upon personal knowledge as to her own actions and her counsel's investigation, and upon information and belief as to all other matters, as follows:

## SUMMARY OF ACTION

1. Plaintiff brings this class action against Defendant for its failure to properly secure and safeguard sensitive information of individuals that was compromised in a cyber incident (the "Data Breach").

2. Defendant operates a global gig-economy and microtask platform through which users create accounts, perform online tasks, track earnings, and designate PayPal or bank-transfer information for withdrawals.

3. As such, Defendant stores a litany of highly sensitive personally identifiable information ("PII") about its customers. But Defendant lost control over that data when cybercriminals infiltrated its insufficiently protected computer systems in the Data Breach.

4. In March 2026, Defendant experienced unauthorized access to its IT Network that resulted in 23,000,000 customers PII being leaked online.[1]

5. The compromised PII includes at least customers full names, email addresses, phone numbers, and home addresses, alongside more sensitive details such as dates of birth, gender, and bank account numbers.[2]

6. To date, Defendant has yet to issue any public disclosure about the Data Breach.

7. Plaintiff's and Class Members' sensitive and confidential PII—which they entrusted to Defendant on the mutual understanding that Defendant would protect it against disclosure—was targeted, compromised and unlawfully accessed due to the Data Breach.

8. The PII compromised in the Data Breach was targeted and exfiltrated by cyber-criminals and remains in the hands of those cyber-criminals who target PII for its value to identity thieves.

9. As a result of the Data Breach, Plaintiff and Class Members suffered concrete injuries in fact including, but not limited to: (i) invasion of privacy; (ii) theft of their PII; (iii) lost or diminished value of PII; (iv) lost time and opportunity costs

---

[1] https://www.helpnetsecurity.com/2026/07/20/paidwork-data-breach-23-million-users/ (last visited August 3, 2026).

[2] *Id.*

associated with attempting to mitigate the actual consequences of the Data Breach; (v) loss of benefit of the bargain; (vi) actual misuse of the compromised data consisting of an increase in spam calls, texts, and/or emails; (vii) statutory damages; (viii) nominal damages; and (ix) the continued and certainly increased risk to their PII, which: (a) remains unencrypted and available for unauthorized third parties to access and abuse; and (b) remains backed up in Defendant's possession and is subject to further unauthorized disclosures so long as Defendant fails to undertake appropriate and adequate measures to protect the PII.

10. The Data Breach was a direct result of Defendant's failure to implement adequate and reasonable cyber-security procedures and protocols necessary to protect consumers' PII from a foreseeable and preventable cyber-attack. Defendant could have prevented or mitigated the consequences of the Data Breach by limiting access to sensitive information to only necessary employees, requiring multi-factor authentication to verify access credentials, encrypting data at rest and in transit, monitoring its systems for signs of unusual activity or the transfer of large volumes of data, and regularly rotating passwords.

11. Moreover, upon information and belief, Defendant was targeted for a cyber-attack due to its status as a company that collects and maintains highly valuable PII on its systems.

12. Defendant maintained, used, and shared the PII in a reckless manner. In particular, the PII was used, stored, and transmitted by Defendant in a condition vulnerable to cyberattacks. Upon information and belief, the mechanism of the cyberattack and potential for improper disclosure of Plaintiff's and Class Members' PII was a known risk to Defendant, and thus, Defendant was on notice that failing to take steps necessary to secure the PII from those risks left that property in a dangerous condition.

13. Defendant disregarded the rights of Plaintiff and Class Members by,

*inter alia*, intentionally, willfully, recklessly, or negligently failing to take adequate and reasonable measures to ensure its data systems were protected against unauthorized intrusions; failing to take standard and reasonably available steps to prevent the Data Breach; and failing to provide Plaintiff and Class Members prompt and accurate notice of the Data Breach.

14. Plaintiff's and Class Members' identities are now at risk because of Defendant's negligent conduct because the PII that Defendant collected and maintained has been accessed and acquired by data thieves.

15. Armed with the PII accessed in the Data Breach, data thieves have already engaged in identity theft and fraud and can in the future commit a variety of crimes including, *e.g.*, opening new financial accounts in Class Members' names, taking out loans in Class Members' names, using Class Members' information to obtain government benefits, filing fraudulent tax returns using Class Members' information, obtaining driver's licenses in Class Members' names but with another person's photograph, and giving false information to police during an arrest.

16. As a result of the Data Breach, Plaintiff and Class Members have been exposed to a heightened and imminent risk of fraud and identity theft. Plaintiff and Class Members must now and in the future closely monitor their financial accounts to guard against identity theft.

17. Upon information and belief, Plaintiff's PII is available on the dark web as a result of the Data Breach.

18. Plaintiff and Class Members will also incur out of pocket costs, *e.g.*, for purchasing credit monitoring services, credit freezes, credit reports, or other protective measures to deter and detect identity theft.

19. Through this Complaint, Plaintiff seeks to remedy these harms on behalf of herself, and all similarly situated individuals whose PII was accessed during the Data Breach.

20. Plaintiff brings this class action lawsuit on behalf of all those similarly situated to address Defendant's inadequate safeguarding of Class Members' PII that it collected and maintained.

21. Plaintiff and Class Members have a continuing interest in ensuring that their information is and remains safe, and they should be entitled to injunctive and other equitable relief.

## JURISDICTION AND VENUE

22. This Court has subject matter jurisdiction over this action under the Class Action Fairness Act, 28 U.S.C. § 1332(d)(2). There are at least 100 putative Class Members, the aggregated claims of the individual Class Members exceed the sum or value of $5,000,000 exclusive of interest and costs, and members of the proposed Class are citizens of states different from Defendant.

23. This Court has jurisdiction over Defendant through its business operations in this District, the specific nature of which occurs in this District. Defendant's principal place of business is in this District. Defendant intentionally avails itself of the markets within this District to render the exercise of jurisdiction by this Court just and proper.

24. Venue is proper in this Court pursuant to 28 U.S.C. § 1391(a)(1) because Defendant's principal place of business is located in this District and a substantial part of the events and omissions giving rise to this action occurred in this District.

## PARTIES

25. Plaintiff is a resident and citizen of Bloomington, Illinois.

26. Defendant is a limited liability company that owns, operates, controls, and/or is responsible for the Paidwork website, mobile applications, user-account systems, payout functions, databases, and privacy and cybersecurity practices at issue.

27. Paidwork LLC is organized under the laws of California with its principal place of business located at 3400 Cottage Way, Suite G2 #27204, Sacramento, California 95825. Paidwork LLC identifies Sacramento as the place for dispute resolution under its currently posted terms.

## FACTUAL ALLEGATIONS

***Defendant's Business***

28. Defendant operates a global gig-economy and microtask platform through which users create accounts, perform online tasks, track earnings, and designate PayPal or bank-transfer information for withdrawals.

29. Plaintiff and Class Members received services from Defendant.

30. In the course of their relationship with Defendant, Plaintiff and Class Members provided Defendant sensitive PII.

31. Upon information and belief, in the course of collecting PII from Plaintiff and Class Members, Defendant promised to provide confidentiality and adequate security for the data it collected from individuals through its applicable privacy policies and through other disclosures in compliance with statutory privacy requirements.

32. Plaintiff and the Class Members relied on these promises and on this sophisticated business entity to keep their sensitive PII confidential and securely maintained, to use this information for business purposes only, and to make only authorized disclosures of this information. Consumers, in general, demand security to safeguard their PII, especially when their Social Security numbers and other sensitive PII is involved.

***The Data Breach***

33. In March 2026, Defendant experienced unauthorized access to its IT

Network that resulted in 23,000,000 customers PII being leaked online.[3]

34. The leaked database reportedly first surfaced in April, when an individual using the alias "hackformetome" advertised it on a well-known cybercrime forum, claiming it was an 11GB dump pulled from Defendant's production systems and contained records of millions of customers.[4]

35. The compromised PII includes at least customers full names, email addresses, phone numbers, and home addresses, alongside more sensitive details such as dates of birth, gender, and bank account numbers.[5]

36. To date, Defendant has yet to issue any public disclosure about the Data Breach.

37. Defendant did not use reasonable security procedures and practices appropriate to the nature of the sensitive information they were maintaining for Plaintiff and Class Members, causing the exposure of PII, such as encrypting the information or deleting it when it is no longer needed.

38. Moreover, Defendant could have prevented or mitigated the consequences of the Data Breach by limiting access to sensitive information to only necessary employees, requiring multi-factor authentication to verify access credentials, encrypting data at rest and in transit, monitoring its systems for signs of unusual activity or the transfer of large volumes of data, and regularly rotating passwords.

39. As a result of Defendant's failures, the attacker targeted, accessed, and acquired files containing unencrypted PII of Plaintiff and Class Members. Plaintiff's and Class Members' PII was accessed and stolen in the Data Breach.

---

[3] https://www.helpnetsecurity.com/2026/07/20/paidwork-data-breach-23-million-users/ (last visited August 3, 2026).

[4] *Id.*

[5] *Id.*

***Data Breaches Are Preventable***

40. Data breaches are preventable.[6] As Lucy Thompson wrote in the Data Breach and Encryption Handbook, "In almost all cases, the data breaches that occurred could have been prevented by proper planning and the correct design and implementation of appropriate security solutions."[7]

41. She added that "[o]rganizations that collect, use, store, and share sensitive personal data must accept responsibility for protecting the information and ensuring that it is not compromised . . . ."[8]

42. Defendant did not use reasonable security procedures and practices appropriate to the nature of the sensitive information they were maintaining for Plaintiff and Class Members, causing the exposure of PII, such as encrypting the information or deleting it when it is no longer needed.

43. Defendant could have prevented this Data Breach by, among other things, properly encrypting or otherwise protecting their equipment and computer files containing PII.

44. As explained by the Federal Bureau of Investigation, "[p]revention is the most effective defense against ransomware and it is critical to take precautions for protection."[9]

45. To prevent and detect cyber-attacks and/or ransomware attacks, Defendant could and should have implemented, as recommended by the United States Government, the following measures:

- Implement an awareness and training program. Because end users are targets, employees and individuals should be aware of the threat of

[6] Lucy L. Thomson, "Despite the Alarming Trends, Data Breaches Are Preventable," *in* DATA BREACH AND ENCRYPTION HANDBOOK (Lucy Thompson, ed., 2012), available at https://lawcat.berkeley.edu/record/394088.
[7] *Id.* at 17.
[8] *Id.* at 28.
[9] How to Protect Your Networks from RANSOMWARE, at 3, *available at:* https://www.fbi.gov/file-repository/ransomware-prevention-and-response-for-cisos.pdf/view

ransomware and how it is delivered.

- Enable strong spam filters to prevent phishing emails from reaching the end users and authenticate inbound email using technologies like Sender Policy Framework (SPF), Domain Message Authentication Reporting and Conformance (DMARC), and DomainKeys Identified Mail (DKIM) to prevent email spoofing.

- Scan all incoming and outgoing emails to detect threats and filter executable files from reaching end users.

- Configure firewalls to block access to known malicious IP addresses.

- Patch operating systems, software, and firmware on devices. Consider using a centralized patch management system.

- Set anti-virus and anti-malware programs to conduct regular scans automatically.

- Manage the use of privileged accounts based on the principle of least privilege: no users should be assigned administrative access unless absolutely needed; and those with a need for administrator accounts should only use them when necessary.

- Configure access controls—including file, directory, and network share permissions—with least privilege in mind. If a user only needs to read specific files, the user should not have write access to those files, directories, or shares.

- Disable macro scripts from office files transmitted via email. Consider using Office Viewer software to open Microsoft Office files transmitted via email instead of full office suite applications.

- Implement Software Restriction Policies (SRP) or other controls to prevent programs from executing from common ransomware locations, such as temporary folders supporting popular Internet browsers or compression/decompression programs, including the AppData/LocalAppData folder.

- Consider disabling Remote Desktop protocol (RDP) if it is not being used.

- Use application whitelisting, which only allows systems to execute

programs known and permitted by security policy.

- Execute operating system environments or specific programs in a virtualized environment.
- Categorize data based on organizational value and implement physical and logical separation of networks and data for different organizational units.[10]

46. To prevent and detect cyber-attacks or ransomware attacks, Defendant could and should have implemented, as recommended by the Microsoft Threat Protection Intelligence Team, the following measures:

**Secure internet-facing assets**

- Apply latest security updates
- Use threat and vulnerability management
- Perform regular audit; remove privileged credentials;

**Thoroughly investigate and remediate alerts**

- Prioritize and treat commodity malware infections as potential full compromise;

**Include IT Pros in security discussions**

- Ensure collaboration among [security operations], [security admins], and [information technology] admins to configure servers and other endpoints securely;

**Build credential hygiene**

- Use [multifactor authentication] or [network level authentication] and use strong, randomized, just-in-time local admin passwords;

**Apply principle of least-privilege**

---

[10] *Id.* at 3-4.

- Monitor for adversarial activities
- Hunt for brute force attempts
- Monitor for cleanup of Event Logs
- Analyze logon events;

**Harden infrastructure**

- Use Windows Defender Firewall
- Enable tamper protection
- Enable cloud-delivered protection
- Turn on attack surface reduction rules and [Antimalware Scan Interface] for Office [Visual Basic for Applications].[11]

47. Given that Defendant was storing the PII of Plaintiff and Class Members, Defendant could and should have implemented all of the above measures to prevent and detect cyberattacks.

48. The occurrence of the Data Breach indicates that Defendant failed to adequately implement one or more of the above measures to prevent cyberattacks, resulting in the Data Breach and data thieves acquiring and accessing the PII of Plaintiff and Class Members.

***Defendant Acquires, Collects, And Stores PII***

49. Defendant acquires, collects, and stores a massive amount of PII, and that PII is required for Defendant to offer its services and conduct its regular business operations.

50. As a condition of obtaining services from Defendant, Defendant required Plaintiff and Class Members to entrust it with highly sensitive personal information.

51. By obtaining, collecting, and using Plaintiff's and Class Members' PII, Defendant assumed legal and equitable duties and knew or should have known that

---

[11] *See* Human-operated ransomware attacks: A preventable disaster (Mar 5, 2020), *available at:* https://www.microsoft.com/security/blog/2020/03/05/human-operated-ransomware-attacks-a-preventable-disaster/

it was responsible for protecting Plaintiff's and Class Members' PII from disclosure.

52. Plaintiff and the Class Members have taken reasonable steps to maintain the confidentiality of their PII and would not have entrusted it to Defendant absent a promise to safeguard that information.

53. Upon information and belief, in the course of collecting PII from customers, including Plaintiff, Defendant promised to provide confidentiality and adequate security for their data through its applicable privacy policy and through other disclosures in compliance with statutory privacy requirements.

54. Plaintiff and the Class Members relied on Defendant to keep their PII confidential and securely maintained, to use this information for business purposes only, and to make only authorized disclosures of this information.

***Defendant Knew, Or Should Have Known, of the Risk Because Companies In Possession Of PII Are Particularly Susceptible To Cyber Attacks***

55. Defendant's data security obligations were particularly important given the substantial increase in cyber-attacks and/or data breaches targeting companies that collect and store PII, like Defendant, preceding the date of the breach.

56. Data breaches, including those perpetrated against companies that store PII in their systems, have become widespread.

57. Defendant's data security obligations were particularly important given the substantial increase in cyberattacks and/or data breaches in recent years. In light of past high profile data breaches at industry-leading companies, including, for example, Microsoft (250 million records, December 2019), Wattpad (268 million records, June 2020), Facebook (267 million users, April 2020), Estee Lauder (440 million records, January 2020), Whisper (900 million records, March 2020), Advanced Info Service (8.3 billion records, May 2020), LoanDepot (16.9 million affected, January 2024), Evolve Bank & Trust (7.6 million affected, May 2024), Financial Business and Consumer Solutions (4.2 million affected, February 2024),

and Prudential Financial (2.5 million affected, February 2024), Defendant knew or, if acting as a reasonable business, should have known that the PII it collected and maintained would be vulnerable to and targeted by cybercriminals.

58. In the third quarter of the 2023 fiscal year alone, 7,333 organizations experienced data breaches, resulting in 66,658,764 individuals' personal information being compromised.[12]

59. In 2024, 3,158 data breaches occurred, exposing approximately 1,350,835,988 sensitive records—a 211% increase year-over-year.[13] Financial service companies such as Defendant were the most attacked companies across all measured sectors in 2024.[14]

60. Indeed, cyber-attacks, such as the one experienced by Defendant, have become so notorious that the Federal Bureau of Investigation ("FBI") and U.S. Secret Service have issued a warning to potential targets so they are aware of, and prepared for, a potential attack. As one report explained, smaller entities that store PII are "attractive to ransomware criminals…because they often have lesser IT defenses and a high incentive to regain access to their data quickly."[15]

61. Additionally, as companies became more dependent on computer systems to run their business,[16] *e.g.*, working remotely as a result of the Covid-19 pandemic, and the Internet of Things ("IoT"), the danger posed by cybercriminals is magnified, thereby highlighting the need for adequate administrative, physical, and

---

[12] *See* https://www.idtheftcenter.org/publication/q3-data-breach-2023-analysis/

[13] 2024 Data Breach Annual Report, Identity Theft Resource Center, https://www.idtheftcenter.org/publication/2024-data-breach-report/

[14] *Id.*

[15] https://www.law360.com/consumerprotection/articles/1220974/fbi-secret-service-warn-of-targeted-ransomware?nl_pk=3ed44a08-fcc2-4b6c-89f0-aa0155a8bb51&utm_source=newsletter&utm_medium=email&utm_campaign=consumerprotection

[16] https://www.federalreserve.gov/econres/notes/feds-notes/implications-of-cyber-risk-for-financial-stability-20220512.html

technical safeguards.[17]

62. Defendant knew and understood unprotected or exposed PII in the custody of companies, like Defendant, is valuable and highly sought after by nefarious third parties seeking to illegally monetize that PII through unauthorized access.

63. At all relevant times, Defendant knew, or reasonably should have known, of the importance of safeguarding the PII of Plaintiff and Class Members and of the foreseeable consequences that would occur if Defendant's data security system was breached, including, specifically, the significant costs that would be imposed on Plaintiff and Class Members as a result of a breach.

64. Plaintiff and Class Members now face years of constant surveillance of their financial and personal records, monitoring, and loss of rights. The Class is incurring and will continue to incur such damages in addition to any fraudulent use of their PII.

65. The injuries to Plaintiff and Class Members were directly and proximately caused by Defendant's failure to implement or maintain adequate data security measures for the PII of Plaintiff and Class Members.

66. The ramifications of Defendant's failure to keep secure the PII of Plaintiff and Class Members are long lasting and severe. Once PII is stolen—particularly Social Security numbers—fraudulent use of that information and damage to victims may continue for years.

67. As a company in custody of a significant volume of PII, Defendant knew, or should have known, the importance of safeguarding PII entrusted to it by Plaintiff and Class Members, and of the foreseeable consequences if its data security systems were breached. This includes the significant costs imposed on Plaintiff and

[17] https://www.picussecurity.com/key-threats-and-cyber-risks-facing-financial-services-and-banking-firms-in-2022

Class Members as a result of a breach. Defendant failed, however, to take adequate cybersecurity measures to prevent the Data Breach.

***Value Of Personally Identifying Information***

68. The Federal Trade Commission ("FTC") defines identity theft as "a fraud committed or attempted using the identifying information of another person without authority."[18] The FTC describes "identifying information" as "any name or number that may be used, alone or in conjunction with any other information, to identify a specific person," including, among other things, "[n]ame, Social Security number, date of birth, official State or government issued driver's license or identification number, alien registration number, government passport number, employer or taxpayer identification number."[19]

69. The PII of individuals remains of high value to criminals, as evidenced by the prices they will pay through the dark web. Numerous sources cite dark web pricing for stolen identity credentials.[20]

70. For example, PII can be sold at a price ranging from $40 to $200.[21] Criminals can also purchase access to entire company data breaches from $900 to $4,500.[22]

71. Among other forms of fraud, identity thieves may obtain driver's licenses, government benefits, medical services, and housing or even give false information to police.

---

[18] 17 C.F.R. § 248.201 (2013).

[19] *Id.*

[20] *Your personal data is for sale on the dark web. Here's how much it costs,* Digital Trends, Oct. 16, 2019, *available at*: https://www.digitaltrends.com/computing/personal-data-sold-on-the-dark-web-how-much-it-costs/

[21] *Here's How Much Your Personal Information Is Selling for on the Dark Web*, Experian, Dec. 6, 2017, *available at*: https://www.experian.com/blogs/ask-experian/heres-how-much-your-personal-information-is-selling-for-on-the-dark-web/

[22] *In the Dark*, VPNOverview, 2019, *available at*: https://vpnoverview.com/privacy/anonymous-browsing/in-the-dark/

72. As a growing number of federal courts have begun to recognize the loss of value of PII as a viable damages theory, the sale of PII from data breaches, as in the Data Breach alleged herein, is particularly harmful to data breach victims – especially when it takes place on the dark web.

73. The dark net is an unindexed layer of the internet that requires special software or authentication to access.[23] Criminals in particular favor the dark web as it offers a degree of anonymity to visitors and website publishers. Unlike the traditional or 'surface' web, dark web users need to know the web address of the website they wish to visit in advance. For example, on the surface web, the CIA's web address is cia.gov, but on the dark web the CIA's web address is ciadotgov4sjwlzihbbgxnqg3xiyrg7so2r2o3lt5wz5ypk4sxyjstad.onion.[24] This prevents dark web marketplaces from being easily identifiable to authorities or those not in the know.

74. A sophisticated black market exists on the dark web where criminals can buy or sell malware, firearms, drugs, and frequently, sensitive personal information like the PII at issue here.[25] The digital character of PII stolen in data breaches lends itself to dark web transactions because it is immediately transmissible over the internet and the buyer and seller can retain their anonymity. The sale of a firearm or drugs on the other hand requires a physical delivery address. Nefarious actors can readily purchase usernames and passwords for online streaming services, stolen financial information and account login credentials, and Social Security

---

[23] *What Is the Dark Web?,* Experian, *available at* https://www.experian.com/blogs/ask-experian/what-is-the-dark-web/ (last visited August 3, 2026).

[24] *Id.*

[25] *What is the Dark Web?* – Microsoft 365, *available at* https://www.microsoft.com/en-us/microsoft-365-life-hacks/privacy-and-safety/what-is-the-dark-web (last visited August 3, 2026).

numbers, dates of birth and other personal information.[26] As Microsoft warns, "[t]he anonymity of the dark web lends itself well to those who would seek to do financial harm to others."[27]

75. Plaintiff's and Class Members' PII is a valuable commodity, a market exists for Plaintiff's and Class Members' PII (which is why the Data Breach was perpetrated in the first place), and Plaintiff's and Class Members' PII is likely being sold by hackers on the dark web (as that is the *modus operandi* of data thieves) – as a result, Plaintiff and Class Members have lost the value of their PII, which is sufficient to plausibly allege injury arising from a data breach.

76. An active and robust legitimate marketplace for PII also exists. In 2019, the data brokering industry was worth roughly $200 billion.[28] In fact, the data marketplace is so sophisticated that consumers can actually sell their non-public information directly to a data broker who in turn aggregates the information and provides it to marketers or app developers.[29] Consumers who agree to provide their web browsing history to the Nielsen Corporation can receive up to $60.00 a year.[30]

77. The PII stolen in this specific Data Breach was particularly harmful.

78. PII can be used to distinguish, identify, or trace an individual's identity, such as their name and Social Security number. This can be accomplished alone, or in combination with other personal or identifying information that is connected or linked to an individual, such as their birthdate, birthplace, and mother's maiden

---

[26] *Id.*; *What Is the Dark Web?,* Experian, *available at* https://www.experian.com/blogs/ask-experian/what-is-the-dark-web/ (last visited August 3, 2026).

[27] *What is the Dark Web?* – Microsoft 365, *available at* https://www.microsoft.com/en-us/microsoft-365-life-hacks/privacy-and-safety/what-is-the-dark-web (last visited August 3, 2026).

[28] https://www.latimes.com/business/story/2019-11-05/column-data-brokers (last visited August 3, 2026).

[29] https://datacoup.com/ (last visited August 3, 2026).

[30] Nielsen Computer & Mobile Panel, Frequently Asked Questions, available at https://computermobilepanel.nielsen.com/ui/US/en/faqen.html (last visited August 3, 2026).

name.[31]

79. The fraudulent activity resulting from the Data Breach may not come to light for years. There may be a time lag between when harm occurs versus when it is discovered, and also between when PII is stolen and when it is used. According to the U.S. Government Accountability Office ("GAO"), which conducted a study regarding data breaches:

> [L]aw enforcement officials told us that in some cases, stolen data may be held for up to a year or more before being used to commit identity theft. Further, once stolen data have been sold or posted on the Web, fraudulent use of that information may continue for years. As a result, studies that attempt to measure the harm resulting from data breaches cannot necessarily rule out all future harm.[32]

80. Plaintiff and Class Members now face years of constant surveillance of their financial and personal records, monitoring, and loss of rights. The Class is incurring and will continue to incur such damages in addition to any fraudulent use of their PII.

***Defendant Fails To Comply With FTC Guidelines***

81. The Federal Trade Commission ("FTC") has promulgated numerous guides for businesses which highlight the importance of implementing reasonable data security practices. According to the FTC, the need for data security should be factored into all business decision-making.

82. In 2016, the FTC updated its publication, Protecting Personal Information: A Guide for Business, which established cyber-security guidelines for businesses. These guidelines note that businesses should protect the personal consumer information that they keep; properly dispose of personal information that

---

[31] *See* OFFICE OF MGMT. & BUDGET, OMB MEMORANDUM M-07-16 n. 1.

[32] *Report to Congressional Requesters*, GAO, at 29 (June 2007), *available at:* https://www.gao.gov/assets/gao-07-737.pdf

is no longer needed; encrypt information stored on computer networks; understand their network's vulnerabilities; and implement policies to correct any security problems.[33]

83. The guidelines also recommend that businesses use an intrusion detection system to expose a breach as soon as it occurs; monitor all incoming traffic for activity indicating someone is attempting to hack the system; watch for large amounts of data being transmitted from the system; and have a response plan ready in the event of a breach.[34]

84. The FTC further recommends that companies not maintain PII longer than is needed for authorization of a transaction; limit access to sensitive data; require complex passwords to be used on networks; use industry-tested methods for security; monitor for suspicious activity on the network; and verify that third-party service providers have implemented reasonable security measures.

85. The FTC has brought enforcement actions against businesses for failing to adequately and reasonably protect consumer data, treating the failure to employ reasonable and appropriate measures to protect against unauthorized access to confidential consumer data as an unfair act or practice prohibited by Section 5 of the Federal Trade Commission Act ("FTCA"), 15 U.S.C. § 45. Orders resulting from these actions further clarify the measures businesses must take to meet their data security obligations.

86. These FTC enforcement actions include actions against companies, like Defendant.

87. Section 5 of the FTC Act, 15 U.S.C. § 45, prohibits "unfair . . . practices in or affecting commerce," including, as interpreted and enforced by the FTC, the

---

[33] *Protecting Personal Information: A Guide for Business*, Federal Trade Commission (2016). Available at https://www.ftc.gov/system/files/documents/plain-language/pdf-0136_proteting-personal-information.pdf

[34] *Id.*

unfair act or practice by businesses, such as Defendant, of failing to use reasonable measures to protect PII. The FTC publications and orders described above also form part of the basis of Defendant's duty in this regard.

88. Defendant failed to properly implement basic data security practices.

89. Defendant's failure to employ reasonable and appropriate measures to protect against unauthorized access to the PII of Plaintiff and Class Members or to comply with applicable industry standards constitutes an unfair act or practice prohibited by Section 5 of the FTC Act, 15 U.S.C. § 45.

90. Upon information and belief, Defendant was at all times fully aware of its obligation to protect the PII of Plaintiff and Class Members, Defendant was also aware of the significant repercussions that would result from its failure to do so. Accordingly, Defendant's conduct was particularly unreasonable given the nature and amount of PII it obtained and stored and the foreseeable consequences of the immense damages that would result to Plaintiff and the Class.

91. As alleged herein, Defendant violated the Safeguards Rule.

***Defendant Fails To Comply With Industry Standards***

92. As noted above, experts studying cyber security routinely identify financial companies in possession of PII as being particularly vulnerable to cyberattacks because of the value of the PII which they collect and maintain.

93. Several best practices have been identified that, at a minimum, should be implemented by financial companies in possession of PII, like Defendant, including but not limited to: educating all employees; strong passwords; multi-layer security, including firewalls, anti-virus, and anti-malware software; encryption, making data unreadable without a key; multi-factor authentication; backup data and limiting which employees can access sensitive data. Defendant failed to follow these industry best practices, including a failure to implement multi-factor authentication.

94. Other best cybersecurity practices that are standard for financial

companies include installing appropriate malware detection software; monitoring and limiting the network ports; protecting web browsers and email management systems; setting up network systems such as firewalls, switches and routers; monitoring and protection of physical security systems; protection against any possible communication system; training staff regarding critical points. Defendant failed to follow these cybersecurity best practices, including failure to train staff.

95. Defendant failed to meet the minimum standards of any of the following frameworks: the NIST Cybersecurity Framework Version 2.0 (including without limitation PR.AA-01, PR.AA.-02, PR.AA-03, PR.AA-04, PR.AA-05, PR.AT-01, PR.DS-01, PR-DS-02, PR.DS-10, PR.PS-01, PR.PS-02, PR.PS-05, PR.IR-01, DE.CM-01, DE.CM-03, DE.CM-06, DE.CM-09, and RS.CO-04), and the Center for Internet Security's Critical Security Controls (CIS CSC), which are all established standards in reasonable cybersecurity readiness.

96. These foregoing frameworks are existing and applicable industry standards for companies, and upon information and belief, Defendant failed to comply with at least one—or all—of these accepted standards, thereby opening the door to the threat actor and causing the Data Breach.

***Common Injuries & Damages***

97. As a result of Defendant's ineffective and inadequate data security practices, the Data Breach, and the foreseeable consequences of PII ending up in the possession of criminals, the risk of identity theft to the Plaintiff and Class Members has materialized and is imminent, and Plaintiff and Class Members have all sustained actual injuries and damages, including: (i) invasion of privacy; (ii) theft of their PII; (iii) lost or diminished value of PII; (iv) lost time and opportunity costs associated with attempting to mitigate the actual consequences of the Data Breach; (v) loss of benefit of the bargain; (vi) statutory damages; (vii) nominal damages; and (viii) the continued and certainly increased risk to their PII, which: (a) remains

unencrypted and available for unauthorized third parties to access and abuse; and (b) remains backed up in Defendant's possession and is subject to further unauthorized disclosures so long as Defendant fails to undertake appropriate and adequate measures to protect the PII.

***Data Breaches Increase Victims' Risk of Identity Theft***

98. The unencrypted PII of Class Members will end up for sale on the dark web as that is the *modus operandi* of hackers that perpetrate such data breaches.

99. Unencrypted PII may also fall into the hands of companies that will use the detailed PII for targeted marketing without the approval of Plaintiff and Class Members. Simply put, unauthorized individuals can easily access the PII of Plaintiff and Class Members.

100. The link between a data breach and the risk of identity theft is simple and well established. Criminals acquire and steal PII to monetize the information. Criminals monetize the data by selling the stolen information on the black market to other criminals who then utilize the information to commit a variety of identity theft related crimes discussed below.

101. Plaintiff's and Class Members' PII is of great value to hackers and cyber criminals, and the data stolen in the Data Breach has been used and will continue to be used in a variety of sordid ways for criminals to exploit Plaintiff and Class Members and to profit off their misfortune.

102. One such example of criminals piecing together bits and pieces of compromised PII for profit is the development of "Fullz" packages.[35]

[35] "Fullz" is fraudster speak for data that includes the information of the victim, including, but not limited to, the name, address, credit card information, social security number, date of birth, and more. As a rule of thumb, the more information you have on a victim, the more money that can be made off of those credentials. Fullz are usually pricier than standard credit card credentials, commanding up to $100 per record (or more) on the dark web. Fullz can be cashed out (turning credentials into money) in various ways, including performing bank transactions

103. With "Fullz" packages, cyber-criminals can cross-reference two sources of PII to marry unregulated data available elsewhere to criminally stolen data with an astonishingly complete scope and degree of accuracy in order to assemble complete dossiers on individuals.

104. The development of "Fullz" packages means here that the stolen PII from the Data Breach can easily be used to link and identify it to Plaintiff's and Class Members' phone numbers, email addresses, and other unregulated sources and identifiers. In other words, even if certain information such as emails, phone numbers, or credit card numbers may not be included in the PII that was exfiltrated in the Data Breach, criminals may still easily create a Fullz package and sell it at a higher price to unscrupulous operators and criminals (such as illegal and scam telemarketers) over and over.

105. The existence and prevalence of "Fullz" packages means that the PII stolen from the data breach can easily be linked to the unregulated data (like insurance information) of Plaintiff and the other Class Members.

106. Thus, even if certain information (such as insurance information) was not stolen in the data breach, criminals can still easily create a comprehensive "Fullz" package.

107. Then, this comprehensive dossier can be sold—and then resold in perpetuity—to crooked operators and other criminals (like illegal and scam telemarketers).

---

over the phone with the required authentication details in-hand. Even "dead Fullz," which are Fullz credentials associated with credit cards that are no longer valid, can still be used for numerous purposes, including tax refund scams, ordering credit cards on behalf of the victim, or opening a "mule account" (an account that will accept a fraudulent money transfer from a compromised account) without the victim's knowledge. *See*, *e.g.*, Brian Krebs, *Medical Records for Sale in Underground Stolen From Texas Life Insurance Firm*, Krebs on Security (Sep. 18, 2014), https://krebsonsecuritv.eom/2014/09/medical-records-for-sale-in-underground-stolen-from-texas-life-insurance-](https://krebsonsecuritv.eom/2014/09/medical-records-for-sale-in-underground-stolen-from-texas-life-insurance-finn/

***Loss Of Time to Mitigate Risk of Identity Theft & Fraud***

108. As a result of the recognized risk of identity theft, when a Data Breach occurs, and an individual is notified by a company that their PII was compromised, as in this Data Breach, the reasonable person is expected to take steps and spend time to address the dangerous situation, learn about the breach, and otherwise mitigate the risk of becoming a victim of identity theft or fraud. Failure to spend time taking steps to review accounts or credit reports could expose the individual to greater financial harm – yet, the resource and asset of time has been lost.

109. Plaintiff and Class Members have spent, and will spend additional time in the future, on a variety of prudent actions, such as researching and verifying the legitimacy of the Data Breach. Accordingly, the Data Breach has caused Plaintiff and Class Members to suffer actual injury in the form of lost time—which cannot be recaptured—spent on mitigation activities.

110. Plaintiff's mitigation efforts are consistent with the U.S. Government Accountability Office that released a report in 2007 regarding data breaches ("GAO Report") in which it noted that victims of identity theft will face "substantial costs and time to repair the damage to their good name and credit record."[36]

111. Plaintiff's mitigation efforts are also consistent with the steps that the FTC recommends that data breach victims take to protect their personal and financial information after a data breach, including: contacting one of the credit bureaus to place a fraud alert (consider an extended fraud alert that lasts for seven years if someone steals their identity), reviewing their credit reports, contacting companies to remove fraudulent charges from their accounts, placing a credit freeze on their credit, and correcting their credit reports.[37]

---

[36] *See* United States Government Accountability Office, GAO-07-737, Personal Information: Data Breaches Are Frequent, but Evidence of Resulting Identity Theft Is Limited; However, the Full Extent Is Unknown (June 2007), https://www.gao.gov/new.items/d07737.pdf.

[37] *See* Federal Trade Commission, *Identity Theft.gov*, https://www.identitytheft.gov/Steps

112. And for those Class Members who experience actual identity theft and fraud, the United States Government Accountability Office released a report in 2007 regarding data breaches ("GAO Report") in which it noted that victims of identity theft will face "substantial costs and time to repair the damage to their good name and credit record."

***Diminution of Value of PII***

113. PII is a valuable property right.[38] Its value is axiomatic, considering the value of Big Data in corporate America and the consequences of cyber thefts include heavy prison sentences. Even this obvious risk to reward analysis illustrates beyond doubt that PII has considerable market value.

114. Sensitive PII can sell for as much as $363 per record according to the Infosec Institute.[39]

115. An active and robust legitimate marketplace for PII also exists. In 2019, the data brokering industry was worth roughly $200 billion.[40]

116. In fact, the data marketplace is so sophisticated that consumers can actually sell their non-public information directly to a data broker who in turn aggregates the information and provides it to marketers or app developers.[41,42]

117. Consumers who agree to provide their web browsing history to the Nielsen Corporation can receive up to $60.00 a year.[43]

---

[38] *See* "Data Breaches Are Frequent, but Evidence of Resulting Identity Theft Is Limited; However, the Full Extent Is Unknown," p. 2, U.S. Government Accountability Office, June 2007, https://www.gao.gov/new.items/d07737.pdf ("GAO Report").

[39] *See, e.g.,* John T. Soma, et al, Corporate Privacy Trend: The "Value" of Personally Identifiable Information ("PII") Equals the "Value" of Financial Assets, 15 Rich. J.L. & Tech. 11, at *3-4 (2009) ("PII, which companies obtain at little cost, has quantifiable value that is rapidly reaching a level comparable to the value of traditional financial assets.") (citations omitted).

[40] *See* Ashiq Ja, *Hackers Selling Healthcare Data in the Black Market*, InfoSec (July 27, 2015), https://resources.infosecinstitute.com/topic/hackers-selling-healthcare-data-in-the-black-market/

[41] https://www.latimes.com/business/story/2019-11-05/column-data-brokers

[42] https://datacoup.com/

[43] https://computermobilepanel.nielsen.com/ui/US/en/faqen.html

118. As a result of the Data Breach, Plaintiff's and Class Members' PII, which has an inherent market value in both legitimate and dark markets, has been damaged and diminished by its compromise and unauthorized release. However, this transfer of value occurred without any consideration paid to Plaintiff or Class Members for their property, resulting in an economic loss. Moreover, the PII is now readily available, and the rarity of the Data has been lost, thereby causing additional loss of value.

119. At all relevant times, Defendant knew, or reasonably should have known, of the importance of safeguarding the PII of Plaintiff and Class Members, and of the foreseeable consequences that would occur if Defendant's data security system was breached, including, specifically, the significant costs that would be imposed on Plaintiff and Class Members as a result of a breach.

120. The fraudulent activity resulting from the Data Breach may not come to light for years.

121. Plaintiff and Class Members now face years of constant surveillance of their financial and personal records, monitoring, and loss of rights. The Class is incurring and will continue to incur such damages in addition to any fraudulent use of their PII.

122. Defendant was, or should have been, fully aware of the unique type and the significant volume of data on Defendant's network, amounting to more than forty thousand individuals' detailed personal information and, thus, the significant number of individuals who would be harmed by the exposure of the unencrypted data.

123. The injuries to Plaintiff and Class Members were directly and proximately caused by Defendant's failure to implement or maintain adequate data security measures for the PII of Plaintiff and Class Members.

***Future Cost of Credit and Identity Theft Monitoring is Reasonable and Necessary***

124. Given the type of targeted attack in this case, sophisticated criminal activity, and the type of PII likely involved, there is a strong probability that entire batches of stolen information have been placed, or will be placed, on the black market/dark web for sale and purchase by criminals intending to utilize the PII for identity theft crimes –*e.g.*, opening bank accounts in the victims' names to make purchases or to launder money; file false tax returns; take out loans or lines of credit; or file false unemployment claims.

125. Such fraud may go undetected until debt collection calls commence months, or even years, later. An individual may not know that his or her PII was used to file for unemployment benefits until law enforcement notifies the individual's employer of the suspected fraud. Fraudulent tax returns are typically discovered only when an individual's authentic tax return is rejected.

126. Consequently, Plaintiff and Class Members are at an increased risk of fraud and identity theft for many years into the future.

127. The retail cost of credit monitoring and identity theft monitoring can cost around $200 a year per Class Member. This is a reasonable and necessary cost to monitor to protect Class Members from the risk of identity theft that arose from Defendant's Data Breach.

***Loss Of Benefit Of The Bargain***

128. Furthermore, Defendant's poor data security practices deprived Plaintiff and Class Members of the benefit of their bargain. When agreeing to provide their PII to Defendant for services, Plaintiff and other reasonable individuals using or applying for Defendant's services understood and expected that they were, in part, providing such information in exchange for necessary data security to protect the PII, when in fact, Defendant did not provide the expected data security. Accordingly, Plaintiff and Class Members received services that were of a lesser

value than what they reasonably expected to receive under the bargains they struck with Defendant.

***Plaintiff's Experience***

129. Plaintiff is a customer of Defendant.

130. As a condition of obtaining services from Defendant, Plaintiff was required to provide her PII to Defendant.

131. Plaintiff is very careful about sharing her sensitive PII. Plaintiff stores any documents containing her PII in a safe and secure location. She has never knowingly transmitted unencrypted sensitive PII over the internet or any other unsecured source. Plaintiff would not have entrusted her PII to Defendant had she known of Defendant's lax data security policies.

132. As a result of the Data Breach, Plaintiff made reasonable efforts to respond to and mitigate the impact of the Data Breach, including researching and verifying the legitimacy of the Data Breach, reviewing her credit report and financial accounts for instances of misuse, changing his passwords, and on other necessary mitigation efforts. Plaintiff has spent significant time dealing with the Data Breach—valuable time Plaintiff otherwise would have spent on other activities, including but not limited to work and/or recreation. This time has been lost forever and cannot be recaptured.

133. Plaintiff suffered actual injury from having her PII compromised as a result of the Data Breach including, but not limited to: (i) invasion of privacy; (ii) theft of her PII; (iii) lost or diminished value of PII; (iv) lost time and opportunity costs associated with attempting to mitigate the actual consequences of the Data Breach; (v) loss of benefit of the bargain; (vi) statutory damages; (vii) nominal damages; and (viii) the continued and certainly increased risk to her PII, which: (a) remains unencrypted and available for unauthorized third parties to access and abuse; and (b) remains backed up in Defendant's possession and is subject to further

unauthorized disclosures so long as Defendant fails to undertake appropriate and adequate measures to protect the PII.

134. The Data Breach has caused Plaintiff to suffer fear, anxiety, and stress, which has been compounded by the fact that Defendant has still not fully informed her of key details about the Data Breach's occurrence.

135. As a result of the Data Breach, Plaintiff anticipates spending considerable time and money on an ongoing basis to try to mitigate and address harms caused by the Data Breach.

136. As a result of the Data Breach, Plaintiff is at a present risk and will continue to be at increased risk of identity theft and fraud for years to come.

137. Plaintiff has a continuing interest in ensuring that her PII, which, upon information and belief, remains backed up in Defendant's possession, is protected and safeguarded from future breaches. Plaintiff alleges that Defendant has failed to implement multi-factor authentication, limit access to sensitive PII to only necessary individuals, and require the encryption of data at rest and in transit.

## CLASS ALLEGATIONS

138. Plaintiff brings this nationwide class action on behalf of herself and on behalf of all others similarly situated, pursuant to Fed. R. Civ. P. 23(a), 23(b)(1), 23(b)(2), 23(b)(3), 23(c)(4) and/or 23(c)(5).

139. The Class that Plaintiff seeks to represent is defined as follows:

> **Nationwide Class**
> All individuals residing in the United States whose PII was accessed and/or acquired by an unauthorized party as a result of the Data Breach ("Class").

140. Excluded from the Class are the following individuals and/or entities: Defendant and Defendant's parents, subsidiaries, affiliates, officers and directors, and any entity in which Defendant has a controlling interest; all individuals who

make a timely election to be excluded from this proceeding using the correct protocol for opting out; and all judges assigned to hear any aspect of this litigation, as well as their immediate family members.

141. Plaintiff reserves the right to amend the definitions of the Class if further information and discovery indicate that the definitions of the Class should be narrowed, expanded, or otherwise modified.

142. Numerosity: The members of the Class are so numerous that joinder of all members is impracticable, if not completely impossible. Upon information and belief, the Class is comprised of hundreds of thousands of individuals. The Class is apparently identifiable within Defendant's records.

143. Common questions of law and fact exist as to all members of the Class and predominate over any questions affecting solely individual members of the Class. Among the questions of law and fact common to the Class that predominate over questions which may affect individual Class members, including the following:

a. Whether and to what extent Defendant had a duty to protect the PII of Plaintiff and Class Members;

b. Whether Defendant had respective duties not to disclose the PII of Plaintiff and Class Members to unauthorized third parties;

c. Whether Defendant had respective duties not to use the PII of Plaintiff and Class Members for non-business purposes;

d. Whether Defendant failed to adequately safeguard the PII of Plaintiff and Class Members;

e. Whether Defendant accurately informed Plaintiff and Class Members that their PII had been compromised;

f. Whether Defendant violated the law by failing to sufficiently notify Plaintiff and Class Members that their PII had been compromised;

g. Whether Defendant failed to implement and maintain reasonable

security procedures and practices appropriate to the nature and scope of the information compromised in the Data Breach;

h. Whether Defendant adequately addressed and fixed the vulnerabilities which permitted the Data Breach to occur;

i. Whether Plaintiff and Class Members are entitled to actual damages, statutory damages, and/or nominal damages as a result of Defendant's wrongful conduct;

j. Whether Plaintiff and Class Members are entitled to injunctive relief to redress the imminent and currently ongoing harm faced as a result of the Data Breach.

144. Typicality: Plaintiff's claims are typical of those of the other members of the Class because Plaintiff, like every other Class Member, was exposed to virtually identical conduct and now suffers from the same violations of the law as each other member of the Class.

145. Policies Generally Applicable to the Class: This class action is also appropriate for certification because Defendant acted or refused to act on grounds generally applicable to the Class, thereby requiring the Court's imposition of uniform relief to ensure compatible standards of conduct toward the Class Members and making final injunctive relief appropriate with respect to the Class as a whole. Defendant's policies challenged herein apply to and affect Class Members uniformly and Plaintiff's challenges of these policies hinges on Defendant's conduct with respect to the Class as a whole, not on facts or law applicable only to Plaintiff.

146. Adequacy: Plaintiff will fairly and adequately represent and protect the interests of the Class Members in that she has no disabling conflicts of interest that would be antagonistic to those of the other Class Members. Plaintiff seeks no relief that is antagonistic or adverse to the Class Members and the infringement of the rights and the damages she has suffered are typical of other Class Members. Plaintiff

has retained counsel experienced in complex class action and data breach litigation, and Plaintiff intends to prosecute this action vigorously.

147. Superiority and Manageability: The class litigation is an appropriate method for fair and efficient adjudication of the claims involved. Class action treatment is superior to all other available methods for the fair and efficient adjudication of the controversy alleged herein; it will permit a large number of Class Members to prosecute their common claims in a single forum simultaneously, efficiently, and without the unnecessary duplication of evidence, effort, and expense that hundreds of individual actions would require. Class action treatment will permit the adjudication of relatively modest claims by certain Class Members, who could not individually afford to litigate a complex claim against large corporations, like Defendant. Further, even for those Class Members who could afford to litigate such a claim, it would still be economically impractical and impose a burden on the courts.

148. The nature of this action and the nature of laws available to Plaintiff and Class Members make the use of the class action device a particularly efficient and appropriate procedure to afford relief to Plaintiff and Class Members for the wrongs alleged because Defendant would necessarily gain an unconscionable advantage since they would be able to exploit and overwhelm the limited resources of each individual Class Member with superior financial and legal resources; the costs of individual suits could unreasonably consume the amounts that would be recovered; proof of a common course of conduct to which Plaintiff was exposed is representative of that experienced by the Class and will establish the right of each Class Member to recover on the cause of action alleged; and individual actions would create a risk of inconsistent results and would be unnecessary and duplicative of this litigation.

149. The litigation of the claims brought herein is manageable. Defendant's uniform conduct, the consistent provisions of the relevant laws, and the ascertainable

identities of Class Members demonstrates that there would be no significant manageability problems with prosecuting this lawsuit as a class action.

150. Unless a Class-wide injunction is issued, Defendant may continue in its failure to properly secure the PII of Class Members, Defendant may continue to refuse to provide proper notification to Class Members regarding the Data Breach, and Defendant may continue to act unlawfully as set forth in this Complaint.

151. Further, Defendant has acted on grounds that apply generally to the Class as a whole, so that class certification, injunctive relief, and corresponding declaratory relief are appropriate on a class- wide basis.

152. Likewise, particular issues are appropriate for certification because such claims present only particular, common issues, the resolution of which would advance the disposition of this matter and the parties' interests therein. Such particular issues include, but are not limited to:

a. Whether Defendant owed a legal duty to Plaintiff and the Class to exercise due care in collecting, storing, and safeguarding their PII;
b. Whether Defendant's security measures to protect their data systems were reasonable in light of best practices recommended by data security experts;
c. Whether Defendant's failure to institute adequate protective security measures amounted to negligence;
d. Whether Defendant failed to take commercially reasonable steps to safeguard consumer PII; and whether adherence to FTC data security recommendations, and measures recommended by data security experts would have reasonably prevented the Data Breach.

## CAUSES OF ACTION

### <u>COUNT I</u>
### Negligence

**(On Behalf of Plaintiff and the Class)**

153. Plaintiff re-alleges and incorporates by reference all preceding allegations in paragraphs 1 through 152 as if fully set forth herein.

154. Defendant required Plaintiff and Class Members to submit non-public PII in the ordinary course of providing them its services.

155. Defendant gathered and stored the PII of Plaintiff and Class Members as part of its business of soliciting its services to Plaintiff and Class Members, which solicitations and services affect commerce.

156. Plaintiff and Class Members entrusted Defendant with their PII with the understanding that Defendant would safeguard their information.

157. Defendant had full knowledge of the sensitivity of the PII and the types of harm that Plaintiff and Class Members could and would suffer if the PII were wrongfully disclosed.

158. By voluntarily undertaking and assuming the responsibility to collect and store this data, and in fact doing so, and sharing it and using it for commercial gain, Defendant had a duty of care to use reasonable means to secure and safeguard their computer property—and Class Members' PII held within it—to prevent disclosure of the information, and to safeguard the information from theft. Defendant's duty included a responsibility to implement processes by which they could detect a breach of its security systems in a reasonably expeditious period of time.

159. Defendant had a duty to employ reasonable security measures under Section 5 of the Federal Trade Commission Act, 15 U.S.C. § 45, which prohibits "unfair . . . practices in or affecting commerce," including, as interpreted and enforced by the FTC, the unfair practice of failing to use reasonable measures to protect confidential data.

160. Defendant owed a duty of care to Plaintiff and Class Members to provide data security consistent with industry standards and other requirements discussed herein, and to ensure that its systems and networks adequately protected the PII.

161. Defendant's duty of care to use reasonable security measures arose as a result of the special relationship that existed between Defendant and Plaintiff and Class Members. That special relationship arose because Plaintiff and the Class entrusted Defendant with their confidential PII, a necessary part of receiving Defendant’s services.

162. Defendant’s duty to use reasonable care in protecting confidential data arose not only as a result of the statutes and regulations described above, but also because Defendant is bound by industry standards to protect confidential PII.

163. Defendant was subject to an “independent duty,” untethered to any contract between Defendant and Plaintiff or the Class.

164. Defendant also had a duty to exercise appropriate clearinghouse practices to remove Plaintiff’s and Class Members’ PII it was no longer required to retain pursuant to regulations.

165. Moreover, Defendant had a duty to adequately notify Plaintiff and the Class of the Data Breach.

166. Defendant had and continues to have a duty to adequately disclose that the PII of Plaintiff and the Class within Defendant’s possession might have been compromised, how it was compromised, and precisely the types of data that were compromised and when. Such notice is necessary to allow Plaintiff and the Class to take steps to prevent, mitigate, and repair any identity theft and the fraudulent use of their PII by third parties.

167. Defendant breached its duties, pursuant to the FTC Act, and other applicable standards, and thus was negligent, by failing to use reasonable measures

to protect Class Members' PII. The specific negligent acts and omissions committed by Defendant include, but are not limited to, the following:

a. Failing to adopt, implement, and maintain adequate security measures to safeguard Class Members' PII;

b. Failing to adequately monitor the security of its networks and systems;

c. Allowing unauthorized access to Class Members' PII;

d. Failing to detect in a timely manner that Class Members' PII had been compromised;

e. Failing to remove Plaintiff's and Class Members' PII it was no longer required to retain pursuant to regulations, and

f. Failing to adequately notify Class Members about the Data Breach's occurrence and scope, so that they could take appropriate steps to mitigate the potential for identity theft and other damages.

168. Defendant violated Section 5 of the FTC Act by failing to use reasonable measures to protect PII and not complying with applicable industry standards, as described in detail herein. Defendant's conduct was particularly unreasonable given the nature and amount of PII it obtained and stored and the foreseeable consequences of the immense damages that would result to Plaintiff and the Class.

169. Plaintiff and Class Members were within the class of persons the FTC Act was intended to protect and the type of harm that resulted from the Data Breach was the type of harm that the statutes were intended to guard against.

170. Defendant's violation of Section 5 of the FTC Act constitutes negligence.

171. The FTC has pursued enforcement actions against businesses, which, as a result of their failure to employ reasonable data security measures and avoid unfair and deceptive practices, caused the same harm as that suffered by Plaintiff

and the Class.

172. A breach of security, unauthorized access, and resulting injury to Plaintiff and the Class was reasonably foreseeable, particularly in light of Defendant's inadequate security practices.

173. It was foreseeable that Defendant's failure to use reasonable measures to protect Class Members' PII would result in injury to Class Members. Further, the breach of security was reasonably foreseeable given the known high frequency of cyberattacks and data breaches in the financial industry.

174. Defendant has full knowledge of the sensitivity of the PII and the types of harm that Plaintiff and the Class could and would suffer if the PII were wrongfully disclosed.

175. Plaintiff and the Class were the foreseeable and probable victims of any inadequate security practices and procedures. Defendant knew or should have known of the inherent risks in collecting and storing the PII of Plaintiff and the Class, the critical importance of providing adequate security of that PII, and the necessity for encrypting PII stored on Defendant's systems or transmitted through third party systems.

176. It was therefore foreseeable that the failure to adequately safeguard Class Members' PII would result in one or more types of injuries to Class Members.

177. Plaintiff and the Class had no ability to protect their PII that was in, and possibly remains in, Defendant's possession.

178. Defendant was in a position to protect against the harm suffered by Plaintiff and the Class as a result of the Data Breach.

179. Defendant's duty extended to protecting Plaintiff and the Class from the risk of foreseeable criminal conduct of third parties, which has been recognized in situations where the actor's own conduct or misconduct exposes another to the risk or defeats protections put in place to guard against the risk, or where the parties

are in a special relationship. See Restatement (Second) of Torts § 302B. Numerous courts and legislatures have also recognized the existence of a specific duty to reasonably safeguard personal information.

180. Defendant has admitted that the PII of Plaintiff and the Class was wrongfully lost and disclosed to unauthorized third persons as a result of the Data Breach.

181. But for Defendant's wrongful and negligent breach of duties owed to Plaintiff and the Class, the PII of Plaintiff and the Class would not have been compromised.

182. There is a close causal connection between Defendant's failure to implement security measures to protect the PII of Plaintiff and the Class and the harm, or risk of imminent harm, suffered by Plaintiff and the Class. The PII of Plaintiff and the Class was lost and accessed as the proximate result of Defendant's failure to exercise reasonable care in safeguarding such PII by adopting, implementing, and maintaining appropriate security measures.

183. As a direct and proximate result of Defendant's negligence, Plaintiff and the Class have suffered and will suffer injury, including but not limited to: (i) invasion of privacy; (ii) theft of their PII; (iii) lost or diminished value of PII; (iv) lost time and opportunity costs associated with attempting to mitigate the actual consequences of the Data Breach; (v) loss of benefit of the bargain; (vi) experiencing an increase in spam calls, texts, and/or emails; (vii) statutory damages; (viii) nominal damages; and (ix) the continued and certainly increased risk to their PII, which: (a) remains unencrypted and available for unauthorized third parties to access and abuse; and (b) remains backed up in Defendant's possession and is subject to further unauthorized disclosures so long as Defendant fails to undertake appropriate and adequate measures to protect the PII.

184. Additionally, as a direct and proximate result of Defendant's

negligence, Plaintiff and the Class have suffered and will suffer the continued risks of exposure of their PII, which remain in Defendant's possession and is subject to further unauthorized disclosures so long as Defendant fails to undertake appropriate and adequate measures to protect the PII in its continued possession.

185. Plaintiff and Class Members are entitled to compensatory and consequential damages suffered as a result of the Data Breach.

186. Plaintiff and Class Members are also entitled to injunctive relief requiring Defendant to (i) strengthen its data security systems and monitoring procedures; (ii) submit to future annual audits of those systems and monitoring procedures; and (iii) continue to provide adequate credit monitoring to all Class Members.

## COUNT II
## Unjust Enrichment
## (On Behalf of Plaintiff and the Class)

187. Plaintiff re-alleges and incorporates by reference all preceding allegations in paragraphs 1 through 152 as if fully set forth herein.

188. Plaintiff and Class Members conferred a monetary benefit on Defendant. Specifically, they provided Defendant with their PII needed for Defendant to carry out its business operations with on the understanding that Defendant would adequately fund data security measures.

189. In exchange, Plaintiff and Class Members should have had their PII protected with adequate data security.

190. Defendant knew that Plaintiff and Class Members conferred a benefit upon it and accepted and retained that benefit by retaining the PII entrusted to it. Defendant profited from Plaintiff's retained data and used Plaintiff's and Class Members' PII for business purposes.

191. Defendant failed to secure Plaintiff's and Class Members' PII and,

therefore, did not fully compensate Plaintiff or Class Members for the value of their payments and that their PII provided.

192. Defendant acquired the PII through inequitable means as it failed to investigate and/or disclose the inadequate data security practices previously alleged.

193. If Plaintiff and Class Members had known that Defendant would not use adequate data security practices, procedures, and protocols to adequately monitor, supervise, and secure their PII, they would not have entrusted their PII to Defendant or obtained services from Defendant.

194. Plaintiff and Class Members have no adequate remedy at law.

195. Defendant enriched itself by saving the costs it reasonably should have expended on data security measures to secure Plaintiff's and Class Members' PII. Instead of providing a reasonable level of security that would have prevented the hacking incident, Defendant instead calculated to increase its own profit at the expense of Plaintiff and Class Members by utilizing cheaper, ineffective security measures and diverting those funds to its own profit. Plaintiff and Class Members, on the other hand, suffered as a direct and proximate result of Defendant's decision to prioritize its own profits over the requisite security and the safety of their PII.

196. Under the circumstances, it would be unjust for Defendant to be permitted to retain any of the benefits that Plaintiff and Class Members conferred upon it.

197. Plaintiff and Class Members are entitled to full refunds, restitution, and/or damages from Defendant and/or an order proportionally disgorging all profits, benefits, and other compensation obtained by Defendant from its wrongful conduct. This can be accomplished by establishing a constructive trust from which the Plaintiff and Class Members may seek restitution or compensation.

198. Plaintiff and Class Members may not have an adequate remedy at law against Defendant, and accordingly, they plead this claim for unjust enrichment in

addition to, or in the alternative to, other claims pleaded herein.

**COUNT IV**
**Breach of Implied Contract**
**(On Behalf of Plaintiff and Class Members)**

199. Plaintiff re-alleges and incorporates by reference all preceding allegations in paragraphs 1 through 152 as if fully set forth herein.

200. When Plaintiff and Class Members provided their PII to Defendant in exchange for Defendant's services, they entered implied contracts with Defendant under which Defendant agreed to reasonably protect such information.

201. Defendant solicited, offered, and invited Class Members to provide their PII as part of Defendant's regular business practices. Plaintiff and Class Members accepted Defendant's offers and provided their PII to Defendant.

202. In entering such implied contracts, Plaintiff and Class Members reasonably believed and expected that Defendant's data security practices complied with relevant laws and regulations and adhered to industry standards.

203. Plaintiff and Class Members would not have entrusted their PII to Defendant in the absence of the implied contract between them and Defendant to keep their information reasonably secure.

204. Plaintiff and Class Members would not have entrusted their PII to Defendant in the absence of its implied promise to monitor its computer systems and networks to ensure that it adopted reasonable data security measures.

205. Plaintiff and Class Members fully and adequately performed their obligations under the implied contracts with Defendant.

206. Defendant breached its implied contracts with Class Members by failing to safeguard and protect their PII.

207. As a direct and proximate result of Defendant's breach of the implied contracts, Class Members sustained damages as alleged here, including the loss of

the benefit of the bargain.

208. Plaintiff and Class Members are entitled to compensatory, consequential, and nominal damages suffered because of the Data Breach.

209. Plaintiff and Class Members are also entitled to injunctive relief requiring Defendant to, *e.g.*, (i) strengthen its data security systems and monitoring procedures; (ii) submit to future annual audits of those systems and monitoring procedures; and (iii) immediately provide adequate credit monitoring to all Class Members.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff, on behalf of herself and Class Members, requests judgment against Defendant and that the Court grant the following:

A. For an Order certifying the Class, and appointing Plaintiff and her Counsel to represent the Class;

B. For equitable relief enjoining Defendant from engaging in the wrongful conduct complained of herein pertaining to the misuse and/or disclosure of the PII of Plaintiff and Class Members;

C. For injunctive relief requested by Plaintiff, including but not limited to, injunctive and other equitable relief as is necessary to protect the interests of Plaintiff and Class Members, including but not limited to an order:

i. prohibiting Defendant from engaging in the wrongful and unlawful acts described herein;

ii. requiring Defendant to protect, including through encryption, all data collected through the course of its business in accordance with all applicable regulations, industry standards, and federal, state or local laws;

iii. requiring Defendant to delete, destroy, and purge the personal identifying information of Plaintiff and Class Members unless Defendant can provide to the Court reasonable justification for the retention and use of such information when weighed against the privacy interests of Plaintiff and Class Members;

iv. requiring Defendant to provide out-of-pocket expenses associated with the prevention, detection, and recovery from identity theft, tax fraud, and/or unauthorized use of their PII for Plaintiff's and Class Members' respective lifetimes;

v. requiring Defendant to implement and maintain a comprehensive Information Security Program designed to protect the confidentiality and integrity of the PII of Plaintiff and Class Members;

vi. prohibiting Defendant from maintaining the PII of Plaintiff and Class Members on a cloud-based database;

vii. requiring Defendant to engage independent third-party security auditors/penetration testers as well as internal security personnel to conduct testing, including simulated attacks, penetration tests, and audits on Defendant's systems on a periodic basis, and ordering Defendant to promptly correct any problems or issues detected by such third-party security auditors;

viii. requiring Defendant to engage independent third-party security auditors and internal personnel to run automated security monitoring;

ix. requiring Defendant to audit, test, and train its security personnel regarding any new or modified procedures;

x. requiring Defendant to segment data by, among other things,

creating firewalls and controls so that if one area of Defendant's network is compromised, hackers cannot gain access to portions of Defendant's systems;

xi. requiring Defendant to conduct regular database scanning and securing checks;

xii. requiring Defendant to establish an information security training program that includes at least annual information security training for all employees, with additional training to be provided as appropriate based upon the employees' respective responsibilities with handling personal identifying information, as well as protecting the personal identifying information of Plaintiff and Class Members;

xiii. requiring Defendant to routinely and continually conduct internal training and education, and on an annual basis to inform internal security personnel how to identify and contain a breach when it occurs and what to do in response to a breach;

xiv. requiring Defendant to implement a system of tests to assess its respective employees' knowledge of the education programs discussed in the preceding subparagraphs, as well as randomly and periodically testing employees' compliance with Defendant's policies, programs, and systems for protecting personal identifying information;

xv. requiring Defendant to implement, maintain, regularly review, and revise as necessary a threat management program designed to appropriately monitor Defendant's information networks for threats, both internal and external, and assess whether monitoring tools are appropriately configured, tested, and updated;

xvi. requiring Defendant to meaningfully educate all Class Members about the threats that they face as a result of the loss of their confidential personal identifying information to third parties, as well as the steps affected individuals must take to protect themselves;

xvii. requiring Defendant to implement logging and monitoring programs sufficient to track traffic to and from Defendant's servers; and

xviii. for a period of 10 years, appointing a qualified and independent third party assessor to conduct a SOC 2 Type 2 attestation on an annual basis to evaluate Defendant's compliance with the terms of the Court's final judgment, to provide such report to the Court and to counsel for the class, and to report any deficiencies with compliance of the Court's final judgment;

D. For an award of damages, including actual, nominal, statutory, consequential, and punitive damages, as allowed by law in an amount to be determined;

E. For an award of attorneys' fees, costs, and litigation expenses, as allowed by law;

F. For prejudgment interest on all amounts awarded; and

G. Such other and further relief as this Court may deem just and proper.

**JURY TRIAL DEMANDED**

Plaintiff hereby demands a trial by jury on all claims so triable.

Dated: August 3, 2026

Respectfully Submitted,

By: /s/ *Kristen Lake Cardoso*

Kristen Lake Cardoso (SBN 338762)
**KOPELOWITZ OSTROW P.A.**
One W Las Olas Blvd, Suite 500
Fort Lauderdale, FL 33301
Tel.: (954) 525-4100
cardoso@kolawyers.com

*Attorney for Plaintiff and the Proposed Class*